## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.                                                          24-cr-268 (RDM)

KYLE CAMPBELL,

               Defendant.

### I.      Introduction

Mr. Campbell comes before this Court having pleaded guilty to one Count of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a) on Capitol grounds on January 6, 2001. The defense requests a non-custodial sentence that substitutes a significant period of home confinement and community service for incarceration. We recognize that a non-custodial sentence is a significant variance from the sentencing guidelines and would not be making this request absent Mr. Campbell's unique family situation.

### II.     Procedural History

Mr. Campbell was arrested on December 11, 2023, appeared in Court in the Southern District of Ohio for a removal hearing and was released with instructions to report by video for an initial appearance in this District on December 15, 2023. He did so, and conditions of release were set. He waived his right to a preliminary hearing and quickly indicated a desire to plead guilty. He subsequently waived his right to an indictment and an information was filed charging him with one count of

1

assault (without a weapon) to which he pleaded guilty on July 1, 2024. Throughout his pretrial release he has been completely compliant with all his release conditions. He debriefed with the government on August 6, 2024, as contemplated in his plea agreement.[1] During that debriefing, Mr. Campbell expressed his remorse and thanked the agents for how professionally they treated him during his arrest. Agents acknowledged that Mr. Campbell had also been respectful and cooperative when they came to arrest him. Mr. Campbell expressed that he has always tried to do the right thing and that he feels like he was a "useful idiot" on January 6. He acknowledged that he had made bad decisions and deeply regretted his actions. He also expressed that he has grown a lot since that day and would never again find himself in that position. These genuine expressions are similar to those he has noted in his letter to this Court, attached at Exhibit 1.

Mr. Campbell has no factual objections to the PSR nor any objections to the guidelines calculation contained therein, which are consistent with the guidelines contemplated in his plea agreement. He does, however, request a variance from those guidelines considering his family situation and the particular circumstances of his participation on January 6. He recognizes the seriousness of his actions and makes no excuse for them. Mr. Campbell stands by the plea agreement but submits that on the facts of his individual conduct, a variance would be appropriate. "[T]he

---

[1] When Mr. Campbell met with the agents, he identified a number of photos of the individual he came to the Capitol with and provided his name, his phone number, and where he was now living. This individual was and is a good friend of Mr. Campbell's dating back to high school. While it was difficult for him to do because of their close relationship, Mr. Campbell cooperated fully with law enforcement.

punishment should fit the offender and not merely the crime," *Pepper v. United States*, 562 U.S. 476, 477 (2011). Considering his family situation and the specific facts of this case, we respectfully request either a sentence of significant home incarceration with community service or a short period of intermittent confinement.

### III.   Application of the Sentencing Factors

#### A. Mr. Campbell's history and characteristics demonstrate that a below guidelines sentence is appropriate.

Mr. Campbell is a 31-year-old single father to a three-year-old daughter. His daughter was a newborn at the time of the criminal conduct in this case and he was engaged to be married to her mother. Everything has changed in the intervening years. He has legal and physical custody of his daughter. He has agreed to share custody with his daughter's mother, but he is her primary parent. The mother of his child does not pay child support and has a history of substance abuse and addiction. His daughter is his everything. He lives in a home in Columbus, Ohio with his parents and daughter. He is the only one who is employed as his father and stepmother are retired. While they contribute to the household expenses, if he is not able to work, they may be unable to remain in the house. (See Exh. 6 and 7). His employer and a coworker have attested to his good character and value to the company and his community. (See Exh. 2 and 3)

As noted in the PSR and in the letters submitted on his behalf, Mr. Campbell has suffered great losses in his life. As a young boy, he lost his mother to cancer. After her death, his father had a difficult time coping with the loss and with the burden of caring for him and his sister alone. They were alone until his father

remarried in 2006, after which family life became much happier. Mr. Campbell is very close with his stepmother. He was also very close to his sister who died tragically from a fentanyl overdose at the age of 31 in 2021. He does not use illegal narcotics and has refrained from consuming alcohol after an alcohol related arrest in 2018. The government has overstated Mr. Campbell's prior encounters with law enforcement in a way that unfairly characterizes him. There is no "troubling escalation of behavior that shows a disregard for the law." Govt SM at 14. Rather, Mr. Campbell's adult life has been largely law-abiding. While he had a prior DUI charge that resulted in a misdemeanor conviction, it is notable that he has not consumed alcohol or drugs since that time. He has no prior felony convictions.

Mr. Campbell is a high school graduate who had goals of attending college, but was financially unable to do so. Instead, he entered the workforce. He obtained licenses to sell insurance in 2013 and 2017 and is gainfully employed in that industry. A felony conviction may have collateral consequences for his licensing and future employment.

Most importantly Mr. Campbell has demonstrated real remorse for his actions, and it is completely unfair to suggest that this remorse is not genuine or only came about because of his impending sentencing. He truthfully acknowledged his wrongdoing when he was approached by law enforcement in 2023. He cooperated fully upon his subsequent arrest. He never suggested that what he had done was acceptable, he didn't claim that his actions were patriotic, and he didn't

minimize what he had been involved in.  He posted nothing on social media. He

recognizes that January 6 was a dark day for the nation. As he has written

> I allowed myself to be swayed by the mob and committed acts that were
> stupid, illegal, dangerous and morally wrong. I of my own free will placed
> myself in an adversarial position, not only towards the Capital Police but also
> to the United States Government. I am embarrassed and ashamed of my
> actions on January 6th.  I will not abdicate my responsibility; I will not make
> light of my actions or attempt to place blame anywhere else except squarely
> on myself. My actions were my own. A core tenet of our reality is cause and
> effect. I brought this upon myself.

(Exh. 1).

He does not claim to have fully realized the wrongfulness of his conduct in

2021, but he never bragged about his behavior. Like many people, after he left the

Capitol grounds that day, he went about his normal life. Unlike many, he didn't

post on social media bragging about his actions. He had a lot going on and he didn't

really focus on what had occurred. As he describes in his letter and as the many

letters submitted on his behalf confirm, his life began to fall apart for reasons

unrelated to January 6 or the lies about the election. A few short months after

January 6, his relationship with the mother of his daughter deteriorated and he

was left struggling to figure out how to raise his daughter while not in a

relationship with her mother. At the same time, his sister with whom he shared an

incredibly strong bond since the passing of their mother when they were both young

children, was struggling with opioid addiction. In September 2021, when she was

discharged unsuccessfully from a long-term rehabilitation program, she moved in

with him and his daughter. Then, tragically, she died from an overdose in his home.

As only he can tell it,

> It was a Tuesday evening, I arrived home later than usual and upon entering I saw my big sister laying on my couch lifeless, my heart sank, and I was gripped with shock. I called 911 and attempted CPR until they arrived but Sarah was gone. She died of a fentanyl overdose. I lost the one person who knew exactly what I had gone through in life and shared the experience with me, I lost my best friend.

(Exh. 1) He focused on his daughter to keep going through the grief that ensued. For the next two years, he gave little thought to politics or what had occurred in January 2021. He was consumed with his daughter and making a good life for her.

Then, on December 11, 2023 the FBI came to arrest him and everything came tumbling down around him once again. Rather than become bitter or resentful or even proud of his actions that resulted in his arrest, he resolved to accept responsibility for what he had done and to face the challenges that were before him as an adult and to set a good example for his daughter.  Again, in his words,

> I've worked diligently to right the wrongs within my own soul. I'm not finished. I believe this is a lifelong work, but I have made substantial gains. I have learned much not only from my mistakes on January 6th but also from reflecting on all my past sins. I will strive to be a better Father, Son and Man and to live my life in a moral and honest fashion. While I hope to avoid imprisonment, I will accept with dignity whatever your decision may be, and I will work to make the most of my lot.

(Exh. 1.)

Mr. Campbell has been consistently employed and is a valued member of his work community. His employer has written a letter in support of Kyle that speaks not only to his value as an employee but also to his personal characteristics.

> Kyle supports his father and step mother financially, both of whom live in Kyle's home. Kyle's sister had battled opioid addiction after losing their mother at a young age. Kyle did everything he could do to help his get sister

clean. He took on the full responsibility to take her to rehab and pick her up, and he managed to help her stay clean for some time while she lived with him. Unfortunately, despite his support, she succumbed to her addiction. Kyle has since also had a child. He has sole custody of her. He is a tremendous father and when he is not at work he is dong fun things with his daughter.

In regards to Kyle as an employee, I can only express how much of an asset he has been. Kyle comes to work everyday, on time and he is both thoughtful and generous with our clients and his co workers. There have been many times he has given a client a ride when they needed one or paid for an uber to get a customer from an accident scene. I only hear about that from clients as Kyle, never brags or mentions what he has done. He is also always willing to help a co worker. Whether that is to answer a question or show someone how do do a task.

I truly believe that the poor judgement Kyle made was because he was influenced. I do not believe his mistake is a representation of who he is. He is well mannered, thoughtful and generous person. He will give the shirt off his back to someone or even his time and money. Most importantly, I believe he learned from his mistake, is sorry for it, and will not be at risk to be easily influenced into a bad decision again.

(Exh. 2).

A coworker also took the time to write a letter for Mr. Campbell, despite their political differences. She writes in part,

Kyle has a four-year-old daughter and he has sole custody of her.  I have had the chance to observe their interaction and Kyle is a magnificent father.  He has  taught his daughter manners and to respect her elders (which I find rare these days).  Kyle is an excellent role model for her.  He treats people with respect, and he ultimately treats others as he would like to be treated.

In addition to his daughter, Kyle supports his parents as well.  When his parents were having financial difficulties, Kyle rented a home where he could invite his parents to live with him.  So, he not only cares for his daughter, but his parents as well.  I feel this should be taken into consideration when determining Kyle's fate.

In summary, Kyle made a mistake that he dearly regrets. Having spoken to him many times, he has taken responsibility for his actions and understands they were wrong. His regret is sincere. That being said, one

mistake should not define a man. The man I know today is thoughtful, selfless, and caring of those around him.

(Exh. 3).

Kyle's family members have also written in his support. They consistently refer to his remorse for having participated in the events of January 6, his steadfast love of his daughter and parents, his hard work to support his family and community, and his tenacity in overcoming his difficult past. His aunt writes in part,

> [Kyle] is a good, decent man, a devoted son, and a wonderful father. Unfortunately, he got caught up in a out-of-control furor, instigated by a powerful man and a zealous crowd and made some bad decisions. Is he sorry he even decided to go to Washington D.C. on January 6th?  Absolutely, he is!
>
> Kyle has faced so much hard luck in his short life, starting with losing his mother when he was four years old. My brother (Kyle's father), whom I dearly love, was somewhat ill-equipped to be a sjngle parent to two young children, especially when he was steeped in grief himself, which probably made for some pretty rocky times for Kyle and his sister growing up. Despite all that, Kyle. has entered the workforce and made a good life for himself and his daughter. He accepted fatherhood with responsibility, joy, and a desire to be an ever-present father in his daughter's life. She worships him and oddly enough, now his daughter may lose her father at the same age he lost his mother....thankfully, not permanently (let us pray), but it doesn't make it any easier for her to understand. How do you explain to a 4-year-old that Daddy isn't here? I pray that you will return him to his daughter and let him continue to provide for his family.

(Exh. 4).  A cousin adds in part,

> I do not know all the circumstances regarding January 6th, but I do know that if Kyle could rewind the clock and not attend, he certainly would do so. The thought of possibly losing his source of income for his daughter, along with not being able to see her for a long period of time is a weight almost too heavy to bear. I am much older than Kyle and therefore, have watched him grow up. He did not have the easiest cards dealt in life, but what a joy it has been to see him delve into fatherhood and the workforce with integrity and outstanding character.

(Exh. 5). Kyle's father also writes of his love and commitment to his family, his remorse for his actions on January 6, and points out that

> Kyle made a bad decision on Jan 6. Encouraged by an irresponsible father and a politician who could not admit defeat. I trust in your sense of justice, and we realize there is a price to pay for Kyle's actions. I am pleading with you not to take him away from his daughter, his family and friends who love and admire my son.

(Exh. 6). His stepmother speaks of the effects of the trauma he has faced in losing not only his mother at a young age, but his beloved sister.

> She and Kyle were very close, and her death had a profound impact upon his life. This was a devasting blow to our family. It truly knocked all of us for a loop. We continue to stay strong, though, and try to live our lives with love and to be good upstanding people. After living through all our tragedies and losses thus far, Kyle has taken a course in his life where he decided not to make the mistakes his sister did and to be a good and responsible person. He has flourished in his efforts and continues to amaze us with his accomplishments.

(Exh. 7). She also speaks of the assistance he provides to her and her husband in addition to caring for his daughter.

> He has a good job that he is successful in. He has a beautiful four year old daughter, that he is a single parent to. My husband and I are older and retired. Kyle Decided to move us in with him and our granddaughter to help us as we age.
>
> Kyle is very much needed at home. He very much regrets having gone on January 6. He knows it was a mistake. He was not part of any organizations or groups, and certainly did not go there to damage any property or to hurt anyone. My husband, Kyle and myself share expenses for our house. If Kyle is not here my husband and I will have to move out. Not to mention he needs to be home for his daughter.

(Exh. 7).

In light of his history and background and unique family situation, a variance is warranted.

### B. The nature and circumstances of Mr. Campbell's participation in the offense warrants a variance.

Mr. Campbell drove from Columbus, Ohio to Washington D.C. with a long-time friend early in the morning on January 6.  They had no plans to meet anyone else in D.C.  Neither were they planning to protest at the Capitol building.  Their intent was simply to attend the rally at the Ellipse. They never actually made it to the rally. By the time they arrived, the crowds were already headed toward the Capitol Grounds, and they followed suit. That is how they ended up being at the front of the crowd – it was not a plan. The government acknowledges that this is true. (Gov't SM at 4). Open-source photos show that they arrived on the Capitol grounds earlier than most people who attended the rally:

**Breaching west plaza est. 12:57PM per Parler info.** Parler | Smooth McGarrett (SmoothMcGarrett) fz0nhPLWowFx.mp4
https://web.archive.org/web/submit?url=https://video.parler.com/fz/0n/fz0nhPLWowFx.mp4 Timecode: 1:04



The crowd then quickly grew around them.

Court Document Screenshots & Case Files Pezzola Video Exhibit 1A.mp4
https://propublica- data-j6cases-videos.s3.us-east-
1.amazonaws.com/a146620018d5013a36652cde48001122.mp4 Timecode: 1:44



As the government has acknowledged, the assault occurred after Mr. Campbell was pushed into the police line. (Gov't SM at 6). When law enforcement pushed back, completely appropriately, Mr. Campbell acted unlawfully and assaulted the officers, before moving away.

Mr. Campbell was not anticipating violence nor did he plan for or seek violence. Mr. Campbell is not, and has never been, associated with any extremist groups. He did not carry a weapon of any sort – actual or makeshift - nor did he wear defensive or tactical gear. He didn't try to hide or disguise his identity. Much of the time he was present on Capitol grounds he was seen just milling about, albeit much of the time towards the front of the crowd.  Had he not been pushed into the police officers, causing them to push back at him, it is unlikely that the assault would have occurred.

Just after the assault, Mr. Campbell retreated into the crowd where he and others were indirectly sprayed.  He then walked towards the officers but was just trying to get out of the crowd and have some air to recover.  Several Capitol Police Officers spoke to him and some leaned in, presumably to hear him better. Mr. Campbell recalls that these officers were asking him if he was ok.  They do not appear to have felt threatened by him. Three of the four officers closest to him were not wearing riot gear or even helmets. They allowed him to stand there with his friend. And neither he and his friend nor the officers were being confrontational. Again, this does not excuse his prior behavior, it is offered merely to show there was no pattern of continued violent behavior that followed the assault.







ia904500.us.archive.org/23/items/6u8pBq4eDQBThpyoa/FB_20210106_135438.mpeg4 at 24:52



Same video [at 25:36]



After recovering near the front of the crowd, Mr. Campbell went back into the crowd and watched from a distance.



Lower west plaza. YouTube | Storyful Rights Management (Steve Baker) Extended Footage
Charts Rioters Breaking Into Capitol And Battling Police
https://www.youtube.com/watch?v=_E-_6bRNfx2c&t=464 Timecode: 7:44



Lower west plaza est. 1:42PM per Parler info. Parler tX5MVBwjXcx1.mp4
https://web.archive.org/web/20210110214432/https://video.parler.com/tX/5M/tX5MVBwjXcx1.m p4  Timecode: 0:08



West plaza. https://images.squarespace-
cdn.com/content/v1/600106e935ba2f68ba250262/1633111604878
- YUFQRM3PUSLBNWPE83TP/009+-+2021+-
+Capitol+Insurrection+-
+Photographer+John+Minchillo.jpg



NW plaza exit wing. Emily Molli | 2021-01-06 EMOLLI_MVI_2382-003.MP4 Timecode: 7:11 https://www.dropbox.com/s/kaq7cfwn6cmcqlv/EMOLLI_MVI_2382-003.MP4?dl=0



He did not approach the front line of officers again, and backed off and peacefully

observed the rest of the day. This is not to suggest that he acted properly – he

should have left the area all together. His mere presence was disruptive in that it contributed to the overall chaos and inability of the officers to regain control.

Later, when he went up on the upper west terrace, it was well after others had breached the terrace by advancing on the Northwest Terrace while he was on the ground.

https://web.archive.org/web/20210110212155/https://video.parler.com/Kt/25/Kt25Rk
V5kgVj_sm
all.mp4  Timecode: 4:22



While on the Upper West Terrace, he walked around and remained peaceful. He did not go inside or even attempt to do so. He can be seen standing on the Upper West Terrace singing the National Anthem with the crowd.

https://archive.org/download/CiWfa4smTx2CvTQH4/20210106_143626.mpeg4



And, while he should have left earlier, he did exit Capitol Grounds earlier than many.  He can be seen at 3:11pm – Leaving the Upper Terrace via the ramp at the

northeast corner (exiting cap grounds)



*Alternate angle:*



Images of the remaining crowds on the Capitol grounds at 3:11p.m. on the west side, the NW terrace and the east side:



These screenshots demonstrate the Mr. Campbell exited much earlier than many of the demonstrators.

### C. While the enhancement for official victim applies, the degree to which it dramatically increases his guideline range given the facts of the offense conduct warrant a variance.

With Mr. Campbell's agreement, a 6-level enhancement has been applied pursuant to U.S.S.G § 3A1.2 because the victim was a government official. Consideration of a variance is appropriate because that enhancement typically applies when there is an animus towards a government official. Mr. Campbell was not predisposed to be motivated by the officer's status but acted out of character and

in response to being pushed into the officer and then reacting when the officer pushed back. This does not excuse his behavior but it is mitigating.

The applicable guideline provides in part:

(Apply the greatest):

(a) If (1) the victim was (A) a government officer or employee; (B) a former government officer or employee; or (C) a member of the immediate family of a person described in subdivision (A) or (B); and (2) the offense of conviction was *motivated by such status*, increase by 3 levels;

(b) If *subsection (a)(1) and (2) apply, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offense Against the Person),* increase by 6 levels.

In the commentary, the Commission explains in pertinent part that "motivated by such status," means that the offense of conviction was motivated by the fact that the victim was a government officer or employee. Id. cmt. n.3. Again, we do not dispute that the enhancement is appropriately applied here, as agreed to in the plea agreement, but note that because a 6-level increase is dramatic, and its application in this case over emphasizes the importance of the victim's status in the actions taken, a variance is warranted.

Moreover, while he acted unlawfully in his response to the Officer pushing him with his shield, this is different from someone who assaults an officer with no provocation. Again, not an excuse and certainly not a suggestion that the Officer acted improperly in anyway, but Mr. Campbell was not looking for a fight -- he stumbled into one and then didn't have the good judgement to remove himself from the situation.

### D. While Mr. Campbell does not qualify for the zero-point offender, the rationale behind 4C1.1 applies to him and supports an equivalent variance.

Additional support for a non-custodial sentence would be the rationale behind the newly enacted 4C1.1 reduction for zero-point offenders. Mr. Campbell does have one criminal history point but it is for a traffic infraction that appears to have involved impairment, although the description is vague. The rationale that underlies the provision supports a variance for similar reasons. The provision was enacted because significant research finds that zero-point offenders are unlikely to recidivate. The same applies in this case despite the actions taken by Mr. Campbell. He is very unlikely to recidivate.

### E. A Below Guidelines Sentence will provide just punishment and achieve deterrence

Any sentence of incarceration could cause Mr. Campbell to lose his job and cause significant hardship to his daughter and parents. Mr. Campbell will certainly face challenges if wishing to pursue other professional avenues, and he will no doubt encounter other roadblocks due to this felony conviction.

Following any term of incarceration, Mr. Campbell will continue to be monitored on supervised release with restitution obligations, which, to be clear, are in and of themselves forms of punishment. *See Mont v. United States*, 139 S. Ct. 1826, 1834 (2019) ("Supervised release is a form of *punishment* that Congress prescribes along with a term of imprisonment as part of the same sentence.") (emphasis added); *United States v. Haymond*, 139 S. Ct. 2369, 2380 n. 5 (2019) ("[T]he sword of Damocles hangs over a defendant every time he wakes up to serve

a day of supervised release."); *Gall v. United States*, 128 S. Ct. 586, 595-96 (2007)

(noting that even a non-custodial sentence imposes serious restrictions on one's

liberty and constitutes punishment, not a "free pass"); *see also United States v.*

*Cohen*, 459 F.3d 490, 496 (4th Cir. 2006) ("[R]estitution is […] part of the criminal

defendant's sentence.").

The collateral consequences that attend to Mr. Campbell's felony conviction

cannot be overstated. District judges have recognized the life-long, damaging impact

of a felony conviction can be relevant to sentencing. *United States v. Andrew*

*Cavanaugh*, 21-cr-362 (APM), Sentencing Transcript at pg. 29. Similarly, in

imposing a variant probationary sentence, Judge Frederic Block of the Eastern

District of New York issued a written opinion on the relevance of collateral

consequences to his sentencing determination and urged that judges "consider such

consequences in rendering a lawful sentence." *United States v. Nesbeth*, 188 F.

Supp.3d 179 (E.D.N.Y. 2016). Judge Block wrote:

> There is a broad range of collateral consequences that serve no useful
> function other than to further punish criminal defendants after they have
> completed their court-imposed sentences. Many—under both federal and
> state law—attach automatically upon a defendant's conviction. The
> effects of these collateral consequences can be devastating. … Myriad
> laws, rules, and regulations operate to discriminate against ex-offenders
> and effectively prevent their reintegration into the mainstream society
> and economy. These restrictions amount to a form of civil death and send
> the unequivocal message that "they" are no longer part of "us."

188 F. Supp. at 3d at 179 (*internal quotations, alterations, and citations omitted*).

In *Nesbeth*, the defendant was also a first offender, convicted of importation of

drugs. Though that defendant's guideline range was 33-41 months, Judge Block

"rendered a nonincarceratory sentence. . . in part because of the number of statutory and regulatory collateral consequences in balancing the 18 U.S.C. § 3335(a) factors." *Id.* at 180. *See also United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009) (despite guidelines of 78-97 months, district judge imposed sentence of twenty months in part because conviction "made it doubtful that the defendant could pursue his career as an academic or translator, and therefore that the need for further deterrence and protection of the public is lessened because the conviction itself already visits a substantial punishment on the defendant"); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (loss of the defendant's "teaching certificate and his state pension as a result of his conduct" is appropriate sentencing consideration consistent with requirement that "the sentence reflect the need for just punishment and adequate deterrence").

With respect to deterrence, it is often presumed that incarceration is necessary to achieve deterrence, and that the more incarceration imposed, the greater the deterrent effect. However, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."[2]

---

[2] Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just. 1, 28 (2006) ("Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence."); see also National Institute of Justice, Five Things About Deterrence, at 1 (May 2016), https://www.ojp.gov/pdffiles1/nij/247350.pdf (stating, among other things, that "[i]ncreasing the severity of punishment does little to deter crime," and "[t]he certainty of being caught is a vastly more powerful deterrent than the punishment"); Ellen Raaijmakers et al., Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected

In short, there is little empirical support for the prospect that a period of confinement will be any more effective at deterring Mr. Campbell or others from committing this offense.

### F. A sentence below what the government is seeking would avoid unwarranted disparities.

The guidelines are not mandatory and can lead to a sentence that is greater than necessary to accomplish the goals of sentencig. In this case, a sentence below the guidelines would accomplish those goals and would not lead to disparity. While no two cases present the same combination of bad acts and mitigating factors, a comparison of Mr. Campbell's participation and circumstances supports a lower sentence.

First, there have been several cases that involved the same charge of a violation of 111(a) that resulted in a non-custodial sentence or a sentence of intermittent confinement:

- *United States v. Adam Jackson,* 22-cr-230 (RC): Jackson pleaded guilty to assault on a police officer (111a) and was sentenced to 36 months of

___

Element in Testing Deterrence Theory, 54 J. of Rsch. in Crime and Delinq. 1, 4 (2017) ("[T]he available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found support for a clear specific deterrent effect."); Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased."); Zvi D. Gabbay, Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity").

Probation with the special conditions of 12 months Home Detention and 52 weekends of Intermittent Confinement,[3] notwithstanding the Government's recommendation of 41 months incarceration. Jackson hurled a large cone at officers, and then using a stolen police shield, and with a running start, he rammed the frontline officers, causing two of them to fall to the ground. He celebrated the violence that he was witnessing and filming, cheering on and encouraging rioters to break through the tunnel. He also talked of returning on inauguration day. When he was arrested, he denied even seeing violent behavior let alone participating in it and claimed he never got near the tunnel. His guidelines (37 to 46 months) were higher than Mr. Campbell's because of the use of a dangerous weapon. He had two prior misdemeanor convictions and a felony conviction for assault as well as arrests for terroristic threats and assault. These were all too old to be scored.[4] While Counsel does not have access to the transcript, it appears based upon the sentencing submission of the defense, that the substantial variance was due to his family situation and his genuine remorse.

- *United States v. Matthew Council,* 21-cr-207 (TNM): Council confronted law enforcement on the west front, then entered the Capitol building through the Parliament door and assaulted officers by lowering his head, sticking out his arms and ramming into a line of police officers, pushing them back.[5]

---

[3] ECF 86, Judgment as to Adam Lejay Jackson
[4] ECF 80, Government Sentencing Memo
[5]  ECF 64, Government Sentencing Memo

He then falsely portrayed his own actions and the actions of those around him when interviewed by law enforcement. (He was one of few people arrested that same day). Ultimately he pleaded guilty to all charges, including assault and civil disorder, without entering into a plea agreement. Long after the charges were brought, he continued to espouse conspiracy theories and held himself out as a political prisoner. The government requested 30 months incarceration and Mr. Council was sentenced to 60 months probation.[6] It appears from the defendant's sentencing memorandum that the significant variance was likely for mental health reasons or because of perceived differences in the prosecution of these protests and others, although Counsel does not have access to the transcript.[7]

There have been other situations where Home Detention (or Home Incarceration) has been determined to be suitable for those with special circumstances even for those charged with felonies and/or facing lengthy periods of incarceration as recommended by the Government. Below are only some examples:

- <u>*United States v. Bennie Parker*, 21-cr-28-5 (APM):</u> Bennie Parker, age 73 years at time of sentencing, and with a serious medical condition (Psoriatic arthritis) was sentenced to 60 months of probation and six months Home Detention, notwithstanding the Government's recommendation of 78-97

---

[6] ECF 75, Judgement
[7] ECF 66, Defendant's sentencing memo.

months incarceration. Bennie Parker was a member of the Oath Keeper's extremist group and was convicted of Conspiracy to Obstruct an Official Proceeding (1512). According to the Government, a critical component of the Oath Keepers' preparation for January 6 was to have an organized quick reaction force ("QRF"), comprised of individuals positioned with a cache of weapons, who could be summoned into the city if ordered by [Stuart] Rhodes.[8] The Parkers contributed to this organized effort by bringing two pistols and an AR-15 to DC and staying at the same hotel as the QRF in Arlington, VA. The Parkers arrived on capitol grounds wearing military fatigues, helmets and goggles.  While there, Bennie Parker spoke to the media and forecasted future violence by stating that "it will come to a civil war" and they were "willing to take up arms." Although Bennie Parker's charges are different than Mr. Campbell's, they carried a significantly greater guideline range (78-97 months).

- _United States v. Sandra Parker_, 21-cr-28-4 (APM): Sandra Parker (Bennie Parker's 64 year old wife and primary caregiver) was also sentenced to 60 months probation and 12 months of Home Detention.  Sandra Parker, also an Oath Keeper, had also been convicted of the same charge as her husband, but was also convicted on four additional felony counts including Conspiracy to Defraud the United States, Destruction of Government Property. Obstructing Officers during Civil Disorder, and Conspiracy to Prevent Members of

---

[8] ECF 1018, Government sentencing memo.

Congress from Discharging their Duties.  The Government recommendation was 97-121 months incarceration.[9]

- _United States v. Nicholas Rodean,_ 21-cr-57 (TNM): Nicholas Rodean, a defendant with Asperger's syndrome, was sentenced to 240 days of Home Detention, notwithstanding the Government's recommendation of 57 months incarceration (the low end of his 57-71 months guideline range).  The Court noted the defendant's medical condition at sentencing, stating: _"Ultimately, I believe the unique factors of this case and in particular your Asperger's diagnosis justify a noncustodial sentence..."_ According to the Government, Rodean smashed two windowpanes of the U.S. Capitol building with a flagpole and a metal object during the January 6, 2021 attack. To get to the building, he, together with other rioters, pushed through or past snow fencing, makeshift bike rack barriers, scaffolding, and even a police line on the west side of the building. Once inside, he and other rioters (some of whom were yelling "where are they counting the votes?") pursued U.S. Capitol Police Officer Eugene Goodman up the stairs to the hallway outside of the Senate chamber. Outside of the Senate chamber, Rodean engaged in a stand-off with a line of police officers.[10] Rodean was convicted of all seven counts including the 1361 felony charge (Destruction of Government Property) at a bench trial.

---

[9] ECF 77, Transcript of Sentencing Hearing
[10] ECF 67, Government Sentencing Memo

- *United States v. Paul Johnson,* 21-cr-537 (JMC) The government sought a sentence of 108 months (post Brock, probation and the government argued his guidelines were 63 to 78 months) and the court imposed a sentence of 60 months probation with intermittent confinement (one year of weekends) after a bench trial and conviction on multiple counts including assault with a dangerous weapon (111b) and civil disorder. Johnson equipped himself with a black megaphone, walkie talkie, and black reinforced gloves. He used his megaphone to rile up the crowds, prompting the breach, and also to berate officers. And he, along with his codefendants, assaulted officers with a bike rack, causing significant bodily injury.[11] Unlike Mr. Campbell, Johnson did not accept responsibility for his actions and instead sought donations on a fundraising page that glorified his conduct. Johnson appears to have been granted this significant variance because of his family obligations.[12]

There have also been several cases with convictions for 111(a) that have resulted in sentences of 12 months and one day or less.

- *United States v. Leffingwell,* 21-cr-5 (ABJ): Leffingwell, a 57 year old veteran who entered the Capitol at the Senate wing doors and chanted at officers standing before him to "join us" and then, when two officers tried to repel him and the crowd around him, struck both officers in the head,

---

[11]  ECF 417, Gov't Sentencing Memo.
[12]  ECF 413, Defendant's Sentencing Memo.

landing three blows, pleaded guilty to assault (111a) and was sentenced to 6 months when the government sought 27 months.[13] Mr. Leffingwell's mitigation was his status as a disabled United States veteran. He like Mr. Campbell, was genuinely remorseful.

- *United States v. Bobby Russell,* 23-cr-29 (APM) Russell was on the West front. He leaned into the bike racks and tried to pull them away. He pulled on an officer causing him to fall down the steps. He later continued to the Upper West Terrace where he leaned against law enforcement. The government sought 30 months and he was sentenced to 12 months.

- *United States v. Philip Young,* 21-617 (DLF) Young pleaded guilty to all charges, including assault (111a) and civil disorder (231) without a plea agreement. The government requested a sentence of 40 months and he was sentenced to 8 months. Early in the breach, Young rushed up the stairs, grabbed and lifted a barricade and pushed it into two MPD officers; after being forced back down the stairs, he pushed the barricade forward against the officers a second time. The government sought a dangerous weapon enhancement for the bike rack.

- *United States v. Grayson Sherrill,* 21-cr-282 (TSC): Sherrill violently swung and struck an officer with a metal pole. He then roamed around inside the US Capitol building for 34 minutes, joining others in chanting "NANCY." The government requested 41 months and he was sentenced to seven

---

[13] United States v. Leffingwell, 1:21CR5 (ABJ), ECF. No. 4.

months.[14]

- *United States v. James McNamara*, 23-cr-119 (ABJ) McNamara lunged toward law enforcement and took a swing at an officer while law enforcement was attempting to get the rioters out of the Capitol at the North door. He held the door open and used a bike rack to ram the door open after it was closed. When others got the door open, he tried to enter and got sprayed and shot with rubber bullets. The government sought 27 months and he was sentenced to 12 months.

- *United States v. Joseph Leyden,* 22-cr-314 (TNM) Leyden's guidelines were identical to Mr. Campbells and the government sought the same sentence. Like Mr. Campbell, Leyden was at the front of the crowd. Unprovoked, he lunged at law enforcement on the West front. Even at the time of sentencing, he minimized his conduct.[15] The government sought 27 months and he was sentenced to 6 months. He did not have the familial obligations Mr. Campbell has.

- *United States v. Donnie Wren,* 21-cr-599 (RBW) Wren was convicted after a jury trial of 111(a) and civil disorder as well as entering and remaining in the US Capitol. On the Upper West Terrace he pushed against law enforcement and their shields. He lied to law enforcement following his arrest, claiming falsely that he was merely pushed into the officers and

---

[14] ECF 124, Government Sentencing memo
[15] ECF 46, Government Sentencing Memo

repeated that lie on the stand at trial. After his conviction he continued to claim on social media that he was wrongfully convicted and showed no remorse.[16] His guideline range as calculated by Probation was 46 to 57 months and the government sought a sentence of 51 months. The Court found the guideline range to be 21 to 27 months.[17] The Court noted "considering the fact that you have worked hard all of your life, your employer says that you're a good employee, there's evidence indicating that you appear to be a good father, I take those factors into account. While you've got a couple prior convictions, they aren't the most serious convictions."[18] He was sentenced to 12 months and one day.[19]

- *United States v. James Davis, 21-595 (TJK)* Davis was a member of the Proud Boys. He pushed against an officer's shield and confronted a second officer by pushing and yelling. He was allowed to plead guilty to civil disorder despite the fact that he pushed against the officer's shield with a large wooden stick he carried, made physical contact with an officer, and grabbed at an officer's baton.[20] He also deleted evidence and directed others to do so as well. The government sought 11 months and he was sentenced to 2 months.[21]

---

[16] ECF 158, Government Sentencing Memo
[17] ECF 187 Transcript of Sentencing Hearing
[18] ECF 187 Transcript of Sentencing Hearing
[19]  ECF 173, Judgement
[20] ECF 52 Government Sentencing Memo
[21]  ECF 63 Judgement

There have also been sentences for 111(a) that have resulted in longer sentences, but those cases have generally involved more serious conduct, often including use of a weapon, and/or less acceptance of responsibility and remorse. For example, *United States v. Kevin Douglas Creek,* 21-cr-645 (DLF).  Creek, a former Marine who brought mace and a knife to the Capitol, and came prepared with hand held radios, pleaded guilty to assault (111a) after he pushed through the barricade and grabbed one officer driving him back forcefully several feet, striking him in the face shield before letting him go (arguably a physical restraint that could have resulted in a 3 level increase) and shoved another officer to the ground and kicked him. He also picked up a ratchet strap – a thick strap with heavy metal buckles and threw it at the officers.[22]  He was sentenced to 27 months, the government's request.[23] While this is the same sentence the government requests in this case, that case was more egregious, Mr. Creek expressed no remorse, and the case didn't present the same mitigating factors.

The government cites *United States v. Kevin Galetto,* 21-cr-517 (CKK) as one of only two comparator cases in their sentencing memo. However, that case involved *two* convictions – civil disorder and assault. They planned in advance to attend the rally and to "fight for our freedom." Galetto purchased walkie talkies for himself and his friend. Galetto was one of the first people to enter the tunnel and violently confront officers who were trying to hold the amassing crowd back.

---

[22] ECF 48, Government Sentencing Memo
[23]  ECF 59, Judgement

He "did so immediately after watching a group of officers go into the tunnel ahead of him while continuing to use non-lethal munitions to disperse the advancing rioters, including Galetto. He grabbed an officer's shield and engaged with him for two minutes. He also knocked an officer to the ground and then kneeled over him, offering him no assistance while the officer "faced an extremely high risk of being crushed underfoot of the rioters." Later, as he exited the tunnel, Galetto summoned more rioters to enter the tunnel. He then reentered the tunnel a second time and participated in and encouraged others to assault officers with the now infamous "heave ho" at the tunnel where he remained for nearly two hours. He was sentenced to 27 months at the government's request.[24]

*United States v. Ricky Wilden,* 21-cr-423 (RC); Wilden, a member of the Proud Boys, assaulted numerous police officers with a chemical irritant while he wore goggles that he had brought with him and then threw the canister at the officers; he entered the Capitol. After January 6 he deleted Facebook messages and videos.[25]  He pleaded guilty to assault (111a) and the government sought 30 months. At the time of his sentencing, he had a pending charge for felony assault of his spouse with a deadly weapon and was using illegal substances while on release. Despite assaulting with a chemical irritant and the empty canister, he was not required to plead to the more serious assault charge and did not receive the dangerous weapon enhancement. He was sentenced to 24 months. These facts

---

[24]  ECF 69, Judgement
[25] ECF 36, Government Sentencing Memo

are considerably more egregious than those in Mr. Campbell's case.

Other cases demonstrate a similar pattern of sentences well below the government's ask:

- *United States v. Salvatore Vassallo,* 22-cr-325 (ABJ) Vassallo was a member of the Proud Boys. He was on the upper West Terrace and grabbed an officer and attempted to shove him off the wall. The government sought 27 months and he was sentenced to 18 months.

- *United States v. Sargent,* 21-cr-258 (TFH): Sargent pleaded guilty to assault on a police officer (111a) and civil disorder (231), among other charges, and was sentenced to 14 months incarceration when the government requested 27 months. In addition to twice swinging at an officer, he recorded the scene on social media while boasting, "we got a clash of police going. . . Shit's getting fucking rowdy out here now. We got flash bangs."[26] After striking one officer, Sargent tried to strike another officer, but instead made contact with another protestor. At one point, that defendant bragged that he "duffed an officer in the face." He also told officers "fuck you guys, you guys are either with them or with us and repeatedly berated officers." After the riot, he repeatedly gleefully bragged about punching an officer. After his arrest, he lied to the FBI about his actions.[27]

- *United States v. Michael Dickinson,* 21-cr-649 (JDB): Dickinson threw a

---

[26] ECF 70, Government Sentencing Memo
[27] *Id.*

coffee tumbler at law enforcement and later duped a bucket of liquid on law enforcement. The government requested 27 months and he was sentenced to 20 months.

- *United States v. David Mehaffie,* 21-cr-40 (TNM) Mehaiffie engaged in assaultive conduct inside the tunnel. He was convicted of 111(a) and other charges. The government sought 64 months and he was sentenced to 14 months.

- *United States v. Barton Shively*, 21-cr-151(JMC) Shively shoved and kicked law enforcement on the West front. He was early to arrive on Capitol grounds. The government sought 37 months and he was sentenced to 18 months.

- *United States v. Brian Gunderson,* 21-cr-137 (RC) Gunderson shoved officers on the Northwest Terrace and entered the Capitol and private offices within the Capitol. He showed no remorse. The government sought 46 months and he was sentenced to 18 months.

- *United States v. Kaleb Dillard*, 23-cr-49 (JMC) Dillard used a metal tool to smash the glass windows on the East side Rotunda door. He was the first person to smash the window and one of the first people to enter the East side. After entering, he grabbed an officer by the vest and threw him to the marble floor. The officer hit his head on the marble floor and was injured. This officer suffered vertigo and dizziness for three months following January 6th, but "could not attribute his head injury to any particular

moment during the riot." After that incident, Dillard repeatedly shoved another officer away from the doors to allow other rioters to enter. He then spend approximately 25 minutes in the Capitol.[28] Even at the time of sentencing, he minimized his conduct.[29] The government sought a sentence of 18 months and the Court sentenced Mr. Dillard to 10 months.[30] Dillard did not have family obligations similar to Mr. Campbell and his conduct was more egregious.

- *United States v. Brian Mock*, 21-cr-444 (JEB) According to the government, Mock helped other rioters remove police barricades at the northern end of the West Plaza and committed four separate assaults against police officers. He pushed one officer to the ground and kicked or attempted to kick him. He threw a broken flagpole at another. He pushed a third officer in the back. Mock shoved a fourth officer to the ground, using both hands and all of his body weight to do so, leaving the officer vulnerable to the mob. Mock then stole two USCP riot shields and passed them back to other rioters. Mock was convicted in a bench trial on all 11 counts, including the assaultive conduct. The Court found that he testified falsely. The Government requested a sentence of 109 months. Mock was sentenced to 33 months.[31] This case is not at all comparable but demonstrates the excessiveness of the sentence the government requests here.

---

[28] ECF 35 Government Sentencing Memo
[29] ECF 37 Defendant's Sentencing Memo
[30] ECF 42 Judgement
[31] ECF 112, Government Sentencing memo

- *United States v. Matthew Brackley*, 24-cr-09 (CJN) Brackley pleaded guilty to one count of 111a and had the same guideline calculation. He entered the Capitol, entered the Crypt, and continued towards the Senate Chamber which had only minutes earlier been evacuated. He was shouting Nancy. When officers tried to get him to leave, he turned to the crowd and shoulted "let's go." He then pushed through the officers towards the Senate Chamber. He told the officers to "stand down" and "let us through" as he led rioters further down the hallway. He only retreated when temporarily incapacitated by chemical spray.[32] When he was arrested, he called DOJ corrupt and the FBI the Gestapo. He continued to express no remorse for his conduct. The government requested 28 months and the Court imposed 15 months.[33] While Mr. Brackley had the support of his family and community as demonstrated in his sentencing memorandum,[34] his conduct was far more troubling and his personal characteristics and circumstances far less compelling than Mr. Campbell's.

Finally, but perhaps most importantly, this Court has sentenced several individuals charged with 111(a) and those cases are relevant to considering an appropriate sentence in this case.

- *United States v. Bruno Cua,* 21-cr-107 (RDM): Cua, armed with pepper spray and a stolen baton, attacked a police officer inside the US Capitol

---

[32] ECF 31, Government Sentencing Memorandum
[33] ECF 35, Judgement
[34] ECF 34, Defendant's Sentencing Memorandum.

building who was attempting to lock the doors to the Senate gallery. After assaulting the officer, Cua then rushed into the gallery, jumped down to the Senate floor and sat in the Vice president's chair with his feet up on the desk. He then opened another door, allowing dozens of other rioters onto the floor. Cua then rifled through multiple desks belonging to US Senators but not before using his jacket to attempt cover the lens of a nearby surveillance camera. Cua was convicted of two felonies (111a and 1512) in a stipulated bench trial and was sentenced to 12 months +1 day. The Government had requested 57 months imprisonment.[35]

- *United States v. Michael Lockwood,* 23-146 (RDM) Lockwood elbowed an officer on the Lower West Terrace. He grabbed that same officer and wrestled with him, attempting to take his baton. After obtaining it, he took it home and posted pictures of the baton and bragged about having a souvenir. The government sought 27 months and he was sentenced to 12 months and one day.

- *United States v. Jaime Buteau,* 21-cr-489 (RDM)Buteau pushed chairs inside the area of the crypt to keep the automatic doors from closing. He threw a chair at law enforcement and hit one of the officers. The government sought 42 months and he was sentenced to 22 months.

- *United States v. Matthew Miller*, 21-cr-75 (RDM): Miller pleaded guilty to assault (111a) and obstruction (1512) after he threw beer cans and batteries

---

[35] ECF 328, Government Sentencing memo

41

at officers, and unleashed the contents of a fire extinguisher on more than a dozen officers as other rioters were assaulting them (the same fire extinguisher later thrown at officers by Palmer). He was sentenced to 33 months.[36] This case is distinguishable because he was convicted of 111(a) and 1512 and thus his guidelines were much higher. The government sought a sentence of 51 months. His mitigating factors appear to have been his age (21 years on January 6) and substance abuse difficulties.

- *United States v. Landon Copeland,* 21-cr-570 (RDM): Copeland pushed and fought with law enforcement on the west front, south of the media tower and then used a bike rack to assault officers. The government requested a sentence of 52 months and he was sentenced to 36 months.

- *United States v. Joseph Fisher, 23-cr-305 (RDM)* Fisher pleaded guilty to 8 charges, including assault and civil disorder without a plea agreement Fisher entered the Capitol and while inside, watched as an officer tried to apprehend a rioter. When they approached, he grabbed the officer and pushed the officer while another rioted shoved him from behind. He also grabbed a chair and rammed it into the officer.[37] The government sought a sentence of 46 months and the Court sentenced Fisher to 20 months.[38] This case is more egregious than Mr. Campbell's as Fisher's actions were premeditated, not reactive.

---

[36] ECF 67, Government Sentencing Memo
[37] ECF 33, Government Sentencing Memo
[38] ECF 39, Judgement

- *United States v. Luke Hoffman, 23-329 (RDM)* Hoffman confronted officers at the mouth of the Lower West Terrace tunnel. He aggressively pulled a bike rack fence away from officers and then assaulted another officer by grabbing his police baton. He later sprayed OC spray at an officer. He was wearing a tactical vest and gloves and carried a can of OC based spray and a knife. He pleaded guilty to two 111(a) charges and agreed that a dangerous weapon was used. He got the benefit of not having to plead to 111(b).[39]  The government sought 51 months and the Court sentenced Hoffman to 20 months.[40]

Even 111(b) cases which are not appropriate comparators to 111(a) cases provide support for a lesser sentence for Mr. Campbell when compared to his conduct. Just a few examples include:

- *United States v. Thomas Hamner,* 21-cr-689 (ABJ): Hamner was one of the first to breach the fencing around the Capitol perimeter. After wrestling barricades away from police on the west front, he assisted others in hurling a 10x10 Trump billboard at police.  Hamner pleaded guilty to assault on an officer using a dangerous weapon (111b) and was sentenced to 30 months incarceration, notwithstanding the Government recommendation of 84 months.[41]

- *United States v. Edward Rodriguez,* 21-cr-483 (DLF): Rodriguez pleaded

---

[39] ECF 27 Government Sentencing Memo
[40] ECF 35 Judgement
[41] ECF 28, Government Sentencing Memo

guilty to assaulting officers with a dangerous weapon (111b). He was sentenced to 36 months incarceration when the Government requested 88 months. Rodriguez joined others in pushing against police on the west front and then spraying officers with bear spray, hitting at least one of them directly in the eyes and injuring at least eight officers with the chemical irritant. Many of the officers required hospital care and recalled extreme pain and injuries; some reported that the skin on their faces and hands began to peel off.[42]

- *United States v. Matthew DaSilva,* 21-cr-564 (CJN): DaSilva was charged with assaulting police officers (111a) amongst other charges including Civil Disorder (231).  He used his flagpole to block a door to keep law enforcement from exiting the Capitol building. He then went to the tunnel where he remained for over 2.5 hours during which time he engaged in assault of front line officers and attempted to wrestle riot shields away from them.  At trial, Officer J.S. recalled the pain he felt when DaSilva pushed against him.  DaSilva's actions also caused another officer to lose balance, leaving him exposed to a flying desk drawer thrown by another rioter which hit him in the head.  DaSilva was convicted of six counts in a bench trial. The Government recommended 52 months imprisonment, the midpoint of his guideline range.  He was sentenced to 28 months.[43]

---

[42] ECF 62, Government Sentencing memo
[43] ECF 111, Government Sentencing memo

## IV.    Conclusion

For all of the reasons noted above, the defense respectfully requests a non-custodial sentence, or, in the alternative a sentence that includes only a short term of incarceration followed by supervision with an extended period of home confinement.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Michelle Peterson
Chief Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500
Shelli_Peterson@fd.org